```
 1                  UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NORTH CAROLINA
 2                       SOUTHERN DIVISION

 3  _____
                                       )
    UNITED STATES OF AMERICA,          )
 4                                     )
                                       )  7:16-CR-120-1D
 5            vs.                       )
                                       )
 6  KEJUAN TIZOM SHABAZZ SMITH,        )
                   Defendant.          )
 7  _____)

 8

                          SEPTEMBER 13, 2017
 9                       SENTENCING HEARING
                BEFORE THE HONORABLE JAMES C. DEVER III
10             CHIEF UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13  On Behalf of the Government:

14
    TOBIN LATHAN, ASSISTANT U.S. ATTORNEY
15  U.S. Attorney's Office
    310 New Bern Avenue, Suite 800
16  Raleigh, North Carolina  27601

17

18  On Behalf of the Defendant:

19
    GEOFFREY W. HOSFORD
20  Hosford & Hosford, P.C.
    P.O. Box 1653
21  Wilmington, North Carolina  28401

22

23
                    AMY M. CONDON, CRR, CSR, RPR
24                    Official Court Reporter
                    United States District Court
25                     Raleigh, North Carolina
                Stenotype with computer-aided transcription
```

1          (Wednesday, September 13, 2017, commencing at 9:00 a.m.)

2                          P R O C E E D I N G S

3          THE COURT:  Good morning and welcome to the United

4  States District Court for the Eastern District of North

5  Carolina.

6          The first matter we'll take up is the sentencing of

7  Kejuan Smith.

8          Good morning, Mr. Hosford.  Are you and Mr. Smith

9  ready?

10         MR. HOSFORD:  Yes, sir, we are.

11         THE COURT:  Is the Government ready?

12         MR. LATHAN:  Yes, Your Honor.

13         THE COURT:  At this time I ask that Mr. Smith be

14  sworn or affirmed.

15     (The defendant, Kejuan Tizom Shabazz Smith, was duly

16  sworn.)

17         THE COURT:  Mr. Smith, do you understand that having

18  been sworn, that your answers to my questions are subject to

19  the penalty of perjury, sir?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  And if you were to lie to me you could be

22  prosecuted for perjury or for making a false statement; do you

23  understand that?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  Have you taken any kind of medicine or

1  any other substance in the last 48 hours that would affect your

2  ability to hear and understand these proceedings?

3            THE DEFENDANT:  No, sir.

4            THE COURT:  Do you know why you're here today?

5            THE DEFENDANT:  Yes, sir.

6            THE COURT:  Mr. Hosford, do you have any reason to

7  doubt Mr. Smith's competence to go forward today?

8            MR. HOSFORD:  No, Your Honor.

9            THE COURT:  Does the Government have any reason to

10 doubt Mr. Smith's competence to go forward today?

11           MR. LATHAN:  No, Your Honor.

12           THE COURT:  Based on Mr. Smith's answers to my

13 questions, my observations of Mr. Smith and the answers from

14 counsel, I find he is competent to go forward here today.

15           Mr. Smith, you're here today having entered a plea of

16 guilty to five charges.  The first charge is conspiracy to

17 distribute a quantity of heroin.  The next three charges are

18 distribution of a quantity of heroin and aiding and abetting.

19 The final charge is possession of a firearm by a felon.  You

20 entered a plea of guilty to those charges in this court.

21           In light of some cases from the Supreme Court of the

22 United States including the *Booker, Rita, Gall, Kimbrough,*

23 *Spears* and *Nelson* cases, the sentencing guidelines are no

24 longer mandatory; they're advisory.

25           Nevertheless, in accordance with those cases and the

Fourth Circuit interpreting them, including the *Carter, Pauley*, and *Evans* cases, a sentencing Court still must take into account the now-advisory guidelines.

The Court does this by initially making findings of fact and calculating an advisory guideline range. The Court will then consider all arguments that your lawyer makes on your behalf, any statement you'd like to make, and all arguments of the Assistant United States Attorney. I'll then determine your sentence and announce it here in court this morning. That'll be the process we'll follow.

Mr. Hosford, did you receive a copy of the presentence report?

MR. HOSFORD: Yes, Your Honor.

THE COURT: Mr. Smith, did you receive a copy of that report?

THE DEFENDANT: Yes, sir.

THE COURT: Did you speak with your lawyer, Mr. Hosford, about that report?

THE DEFENDANT: Yes.

THE COURT: At this time the Court directs that the presentence report be placed in the record under seal.

In accordance with Rule 32 of the Federal Rules of Criminal Procedure, the Court accepts as accurate the presentence report, except as to matters in dispute as set forth in the addendum. I have received the entire report,

```
 1    including the addendum.  The addendum does contain numerous
 2    objections.
 3              Mr. Smith, you may have a seat while we take up these
 4    objections.
 5              Mr. Hosford, do you want to be heard on all these?
 6              MR. HOSFORD:  No, Your Honor.  I'd like to be heard
 7    first with objection number six, which deals with the objection
 8    to Mr. Smith's status as a career offender.  That would make
 9    the most sense to begin with, Your Honor.
10              THE COURT:  Okay.  I'll hear you.
11              MR. HOSFORD:  May it please the Court.  We objected
12    to Mr. Smith's status as a career offender as determined by the
13    Probation Office based upon his conviction for common law
14    robbery.
15              The common law robbery conviction, Your Honor, it's
16    our position that that does not qualify as a predicate offense
17    under 4B1.2.  What I cited in the objection was the Gardner
18    case, United States v. Gardner, G-A-R-D-N-E-R, 823 F.3d 793
19    (4th Cir. 2016), which the Court held that the common law
20    robbery was not considered a crime of violence as defined by 18
21    United States Code, Section 924(e)(2)(B)(i).  And that's
22    obviously the career offender section, Your Honor, of the
23    statute of 924.  The career offender in that statute defines
24    violent felony as an offense punishment by imprisonment of a
25    term exceeding one year involving the use or carrying a
```

firearm, knife or destructive device, and has an element of
use, attempted use or threatened use of physical force against
a person of another.

Obviously in 4B1.2, in defining crime of violence for
purposes of career offender, the Guidelines define crime of
violence as an offense punishable by imprisonment exceeding one
year, that one has an element the use, attempted use,
threatened use of physical force against a person of another.

I know the Court is aware of the pending litigation
in the Fourth Circuit now in the *Gattis* case, and Your Honor,
it's our position that based on the decision in *Gardner* and the
logic of *Gardner* would apply here and common law conviction
would not be a predicate offense for career offender purposes.

THE COURT: Mr. Lathan, I got your brief. Do you
want to say anything else?

MR. LATHAN: Just briefly. We'd rest on the
arguments made in our brief, but as the Court is aware, our
primary argument has less to do with the use of force and
issues addressed in *Gardner* and more to do with the fact that
robbery is an enumerated crime under 4B1.2, and it's our
argument that North Carolina's offense of common law robbery
falls within or is narrower than the generic definition of
robbery. And as a result, it does constitute a crime of
violence under 4B1.2, and I would just note, as the Court is
aware, the defendant's objection to the base offense level

1  under 2K2.1 is based on the same issue and that is whether or

2  not that common law robbery conviction qualifies as a crime of

3  violence.  For the reasons set forth in our brief, which I'm

4  happy to expand upon, we argue that it is.

5          THE COURT:  Thank you.

6          You agree, Mr. Hosford, that with respect to -- I

7  think it's the fourth objection, the 2K2.1(A)(1) objection and

8  the career offender objection tee up the same legal issue?

9          MR. HOSFORD:  Yes, Your Honor.

10         THE COURT:  For purposes of both of those issues, the

11  Court has reviewed the PSR and considered the arguments and has

12  considered the sentencing memorandum at Docket Entry 305.

13         The focus here is on whether the common law robbery

14  conviction that Mr. Smith sustained reflected in Paragraph 59

15  qualifies as a crime of violence.  Everyone agrees he has a

16  controlled substance offense for purposes of 2K2.1A(1) and

17  career offender provision as a result of his conviction in

18  Paragraph 61 for conspiracy to sell and deliver heroin and sale

19  and deliver heroin.

20         I have obviously reviewed the *Gardner* case and I've

21  reviewed a number of other cases.

22         To determine whether a specific offense is

23  encompassed within the broader meaning of a crime listed by

24  generic title in a sentencing enhancement provision, the Court

25  must distill a generic definition of the predicate offense and

then determine whether the defendant's prior conviction constitutes a conviction of the generic offense.

The Fourth Circuit describes these issues in *United States v. Peterson*, 629 F.3d 432, 436 (4th Cir. 2011). Distilling a generic definition requires concerning how the offense is applied with the criminal codes in most states.

A defendant's conviction qualifies as a generic conviction of the crime unless the state statute under which he was convicted was broader than the generic definition. See *United States v. Flores-Granados*, 783 F.3d 487, 491, (4th Cir. 2015).

I do think North Carolina's common law robbery statute in this conviction qualifies as a crime of violence under both the Guideline provisions at issue.

The Fifth Circuit published an opinion in *United States v. Santiesteban-Hernandez*, 469 F.3d 376, 380, Footnotes 5 and 6, (5th Cir. 2006), abrogated on other grounds, 711 F.3d 541 (5th Cir. 2013.)

In that opinion, the Fifth Circuit noted that 38 states and the District of Columbia defined robbery as taking a person's property from a person or person's presence by means of force or putting in fear, and 11 other states required taking a person's property in circumstances that put the person in immediate danger in terms of bodily injury.

The statute of the 38 states cited by the Fifth

1   Circuit, including North Carolina, require only force, not
2   substantial force or force beyond de minimis force.
3           I do think that North Carolina's robbery statute
4   falls within this generic concept and definition and thus that
5   conviction qualifies.
6           I also am persuaded by the arguments at pages 3 and 4
7   of the Government's sentencing memorandum concerning the
8   changes to the Guidelines after *Johnson* and the inclusion of
9   robbery and the discussion of both robbery and extortion on
10  pages 3 and 4 of their brief.
11          So that objection with respect to both career
12  offender and calculating the base offense level are overruled.
13          Do you want to be heard on any of the other
14  objections?
15          MR. HOSFORD:  The only other objection I want to be
16  heard on, Your Honor, is the objection to the four-point
17  enhancement for role in the offense.
18          Your Honor, it's our position that Mr. Smith is
19  deserving of a role enhancement.  We are asking the Court to
20  consider a two-point or three-point role enhancement.
21          And without going into too much detail, Your Honor,
22  you know the structure of the gang, you know how it works.
23  Mr. Smith is in charge of the Wilmington part of the gang, but
24  he has other people to whom he has to answer and decide what
25  kind of role he should receive and points should be assessed to

him in looking at 3B1.1 as well as the commentary, I think one
factor that really jumps out is that if a defendant sees a
greater portion of the proceeds referring to the crime, that's
one thing they comment about twice within the Guideline itself
and the commentary.  In this particular case, there really
isn't any evidence that Mr. Smith received greater proceeds of
the crimes of this gang in particular and, you know, in terms
of collecting dues and that the dues go elsewhere and not
Mr. Smith's pocket.

So I'd ask the Court to consider applying a two- or
three-point enhancement in lieu of the four-point enhancement
for Mr. Smith.

THE COURT:  Mr. Lathan?

MR. LATHAN:  It's our position that the four-point
enhancement for a leader and organizer of criminal activity is
applicable in this case.

We recognize that with respect to the one factor of
share of the proceeds, that probably doesn't favor either
party's argument in this case, but there are many other factors
that are notably nonexclusive that are listed in the commentary
of 3B1.1 Note 4 that would -- that would favor a finding that
the defendant was a leader and organizer of criminal activity
in this case.

Just to name a few examples coming from the
uncontested facts in the PSR, one would be the drug conspiracy

that's at issue here and really what we have is a loose-net

conspiracy among members of the 9-Trey Gang in Wilmington to

distribute heroin.  And as a part of that conspiracy, evidence

was derived in this investigation from a Title III wiretap and

also from controlled buys from this defendant, and that

evidence revealed that the defendant had individuals

essentially working for him in his heroin distribution

activities.  He had individuals who were couriers, individuals

who when he sold heroin, that is, the defendant, he would have

these other subordinate gang members actually make the delivery

and collect money on occasions for him.  So he did direct the

activities of others with respect to the drug conspiracy, but,

as the Court knows, it's not just the drugs that are at issue

here.

These offenses relate to a larger and broader

criminal enterprise; and that is, the criminal activities of

the 9-Trey Bloods in Wilmington, because you also have the

firearm offenses that are -- that are at issue at the

sentencing, and I think that's where we find a lot more of the

evidence of the defendant's leadership and organization.

First, directing the Court's attention to paragraph

26 and 30 through 35 of the PSR, this describes a conspiracy to

commit a murder or aggravated assault as part of the offense

conduct in this case.  And essentially, that is that the

defendant as the leader of the 9-Trey Bloods in Wilmington was

1  involved with an altercation with another gang member in

2  Goldsboro, or so-called beef in gang terminology.  And during

3  the period of time of this investigation that the defendant's

4  calls were intercepted pursuant to a Title III wiretap, it

5  became obvious and apparent that the defendant was planning and

6  organizing, orchestrating a plot to travel to Goldsboro to

7  carry out a murder or a hit of this person with whom he had the

8  beef.

9        As part of that plan, the defendant directed his

10 subordinate gang members to deliver to him firearms that belong

11 to the 9-Trey in general.

12       The defendant was the planner of this conspiracy.  He

13 was the brain child.  It was his idea.  He's the one who

14 discussed it.  He's the one who recruited other gang members to

15 participate in this crime of violence, and he's the one who

16 directed those gang members to deliver the firearms to him at a

17 residence in Wilmington where they were compiled, stockpiled in

18 anticipation to travel to Goldsboro to carry out this hit.

19       This all culminates on August 4, 2016, where the

20 defendant holds a gang meeting, where he informs some of the

21 other gang members of what's going to take place the following

22 morning.  The plan is to wake up and travel to Goldsboro to

23 carry out this hit.  And that afternoon, the defendant posts to

24 a social media account a photograph of all of these guns that

25 he's compiled on a kitchen table.

1    At that time, law enforcement was aware that violence

2    was imminent and as they had done on several occasions before

3    during this investigation, they took action to thwart that.  A

4    search warrant is obtained, executed at the house where the

5    defendant had been that day and these firearms, 13 in total,

6    along with ammunition, which we'll describe later, were found

7    near the rear perimeter of the property.

8    As that search warrant is being executed to further

9    evidence the defendant's direction and control over this plot,

10   the defendant is intercepted communicating with a subordinate

11   gang member and directing that gang member to gather some of

12   the other gang members and to try to get those guns and move

13   those guns before law enforcement could find them.  They were

14   not successful in doing that.  Law enforcement did find and

15   seize those guns, but the defendant was the organizer and

16   leader of that criminal activity which was a part of the

17   broader offense conduct at issue in this case.  That's just one

18   example.

19   And I'll briefly mention a few other examples.  The

20   evidence in this case established that the defendant

21   orchestrated a plot to commit a home invasion and robbery of a

22   rival drug dealer known as Reese Gotti, and that's described in

23   paragraphs 36 through 43 of the PSR.

24   Essentially, during the month of July of 2016, the

25   defendant there organized and directed efforts to locate this

other person's residence and then to commit a home invasion and robbery of this person's residence. And on a daily basis the defendant is intercepted communicating with his subordinate gang members in furtherance of his efforts to carry this out.

They're conducting surveillance, the defendant is recruiting other subordinate gang members to participate with him in conducting surveillance and try to carry this out. The defendant directs others to bring him guns as part of this plot that they are going to use to carry out this home invasion and then that all culminates when -- on July 26th when it becomes apparent to law enforcement that this is imminent.

The defendant and others are in a car traveling to, we believe, that residence to carry out this home invasion. Law enforcement initiates traffic stops. Some of the subordinate gang members are arrested or they're stopped, some flee on foot with the guns in hand; and shortly thereafter, a phone call is intercepted between the defendant and one of those gang members where the defendant gives orders to his subordinate gang members related to this conspiracy. And that being tell them to "wipe it down" referring to the firearm and "hurry up and take it to the next trashcan." There, the defendant is directing a subordinate gang member to wipe the fingerprints and DNA off of a firearm and dispose of that firearm in a trashcan to elude detection by law enforcement.

Examples continue. As set forth in paragraphs 44

through 47 of the PSR there was a separate conspiracy to
conduct a drive-by shooting on rival gang members and that too
was led and organized by the defendant.  These were rival
neighborhood gang members known as the BO Boys and on one
occasion during the wire, a subordinate gang member contacts
the defendant -- this is set forth in 44 through 47 of the
PSR -- contacts the defendant and notifies the defendant that
some of the BO Boys are standing outside basically on a street
corner, and the reason for this call is that as the leader of
the gang, as the leader of the 9-Trey, subordinate gang members
were not able to just go out and commit gang-related acts of
violence without his knowledge and without his endorsement.

        So set forth in the PSR there is this call about BO
Boys being on the corner and defendant would proceed to help
organize and direct a would-be drive-by shooting of these rival
gang members which was also thwarted by law enforcement.

        Finally, in paragraph 48 of the PSR there's a call
intercepted where a subordinate gang member contacts the
defendant with regard to committing an armed robbery of another
individual.  This, too, is a subordinate gang member seeking
the defendant's endorsement and permission to do so and the
defendant's response to that subordinate gang member as set
forth in paragraph 48 of the PSR is to mask up, meaning wear a
mask when you do it.

        The defendant organized and directed gang meetings.

1    The investigation established that he recruited new gang

2    members.  He disciplined gang members for their failure to

3    adhere to the rules of the gang.  And for those reasons and

4    others, the defendant was an organizer and leader within the

5    meaning of 3B1.1A.

6                THE COURT:  Thank you.

7                Section 3B1.1(a) provides for a four-level

8    enhancement if the defendant was an organizer or leader of a

9    criminal activity that involved five or more participants or

10   was otherwise extensive.

11               The PSR details that this gang activity that

12   Mr. Smith led involved five or more participants or was

13   otherwise extensive.

14               The Guideline commentary provides relevant

15   consideration for distinguishing leaders and organizers for

16   managers and supervisors.  The commentary notes that titles

17   such as "kingpin" and "boss" are not controlling.  The factors

18   the Court should consider include the exercise of

19   decision-making authority, the nature of participation in the

20   commission of the offense, the recruitment of accomplices, the

21   claimed right to a larger share of the fruits of the crime, the

22   degree of participation in planning or organizing the offense,

23   the nature and scope of the illegal activity and the degree of

24   control and authority exercised over others.

25               Other than the claimed right to a larger share of the

fruits of the crime, all the other factors support the

four-level enhancement in this case.

          The Court notes and has been discussed here, the

defendant during the controlled purchases of heroin had

lower-ranking gang members collect money at his direction and

had runners deliver heroin for him.  These issues are all

discussed in paragraphs 18 and 19 of the PSR.

          The defendant had a beef with a rival gang leader

named Gullah in Goldsboro and decided to carry out a hit or

murder of this rival gang member.  As part of this, he

contacted and directed numerous subordinates and told them to

deliver firearms belonging to the gang as discussed in

paragraph 26 of the PSR.

          The day before the gang was to travel to Goldsboro to

carry out the hit, law enforcement executed a search warrant at

the residence where the guns had been stockpiled along with the

ammunition.  The defendant became aware of the search warrant

being executed and contacted some more of the gang members and

directed them to attempt to retrieve the guns and ammunition.

They were not able to do that because of the presence of law

enforcement.

          During the month of July, the evidence shows and

described in the PSR at paragraphs 36 to 47 that he organized

and directed the gang to commit a home invasion and robbery of

a rival drug -- or gang leader, drug dealer named Reese Gotti.

Again, they traveled, the defendant along with other gang members traveled in their vehicles and in possession of firearms with intent to carry out the home invasion. When it appeared the crime was imminent by virtue of the Title III wiretap, law enforcement was able to intervene with a traffic stop and prevent that impending act of violence that defendant had organized and led.

He also, after that, ordered the gang members to wipe down the guns and get rid of them as described in paragraph 43. The report indicates that a gang member had to seek his approval to commit a robbery, he told him how to do it and mask up as described in paragraph 48.

He led efforts to and organized efforts and exercised decision-making authority and recruited accomplices and participated in planning and exercised control in connection with all of these activities as well as his plans associated with drive-by shootings on rival members of a BO Boys gang and then organizing and directing gang meetings, recruiting gang members, disciplining gang members as the head of the Blood sect in Wilmington.

The four-level enhancement applies in this case and the objection is overruled.

Are there any other objections?

MR. HOSFORD: May it please the Court. We don't need to be heard on the remaining objections.

1              THE COURT:  The other objections don't affect the
2    advisory guideline range and those objections are overruled.
3              Any objections from the United States?
4              MR. LATHAN:  No, Your Honor.
5              THE COURT:  All right.  The total offense level is
6    34, the criminal history category is 6, the advisory guideline
7    range is 262 to 327 months.
8              Does the Government object to that advisory guideline
9    range?
10             MR. LATHAN:  No, Your Honor.
11             THE COURT:  With all your objections preserved, do
12   you agree that as a ministerial matter that that's the
13   calculation that the Guidelines yield for a 34 and a 6?
14             MR. HOSFORD:  Yes, Your Honor.
15             THE COURT:  All right.  I'll hear first from Mr.
16   Hosford, I'll then hear from the defendant, if he wants to make
17   a statement, I'll then hear from Mr. Lathan.
18             MR. HOSFORD:  Your Honor, may it please the Court.
19   About a week ago or so I called a fellow named George Taylor,
20   who's in Wilmington.  Mr. Taylor is an entrepreneur and has
21   several businesses and has been successful in his life.  He has
22   started a program at several of his businesses, part of which
23   is a software company where he is hiring gang members to come
24   work for him.
25             One of the goals of his program, one of his

requirements is that these fellas remain as members of the gang while they get jobs with him and work to become productive members of society.

He's paying these young men in the neighborhood of 40 to $50,000 a year, more money than they have ever seen or made.

Mr. Smith was exposed to Mr. Taylor's program right before he was arrested for the case here. He actually traveled with Mr. Taylor to California, to Los Angeles where they met with some folks who were operating a similar program out in California.

So while he could have benefited greatly by that program, the reason I'm talking about this is when I talked to Mr. Taylor and asked him how is things going, he said that he's had success, had success with some of these fellas that were leaders of other gangs in Wilmington and that they transitioned into this program and can be productive people.

Mr. Smith is obviously looking at a lengthy sentence, Your Honor. When you look at the sentencings that other defendants received in this case, he's going to receive two, three, four times as long as anybody else. He understands that. And he's 24 and about to be 25. He doesn't really have any job skill. We're asking that you recommend vocational training for him while he's in the Bureau of Prisons. We're asking you to recommend educational training for him; he didn't complete high school.

1    And in deciding what sentence is sufficient, but not

2  greater than necessary, we're also asking you not to give up on

3  a 24-year-old about to be a 25-year-old because the report is a

4  terrible report, and he's done terrible things and he's going

5  to serve a really lengthy sentence, but a really lengthy

6  sentence -- I've represented a lot of young men that have gone

7  to prison and a lot of them have the same reaction, that life

8  is over for them.  And it's not over.  He's 24, going to be 25,

9  he's got a lot of life left.

10    The Court can fashion a sentence at the low end of

11  the range which would accomplish the goals of sentencing, it

12  would promote respect for the law, it would incapacitate him

13  for an extended period of time, it would keep him out of

14  Wilmington.  It would give him an opportunity to finish his

15  education, to learn some job skills so that when he does come

16  home, he can come home with something, a way to earn a

17  legitimate living.

18    A guideline sentence within the guideline would meet

19  all those goals of 3553(a) and it would show the public that

20  the Court is not going to tolerate this kind of conduct, it's

21  going to give a lengthy sentence.  A 262-month sentence is, in

22  fact, a lengthy sentence.  It's almost as long as he's been

23  alive.

24    His family is here today.  Obviously, they love him,

25  they support him, they worry about him.  He's ready to face his

1  punishment.  We're just asking that you don't give up on a 24,

2  25-year-old.  That he can make many changes in his life; that

3  the Court can fashion that sentence.

4        Unfortunately for Mr. Smith, he didn't get the

5  benefit of Mr. Taylor's program.  Some others are going to get

6  the benefit.  Those are the requests and those are the reasons

7  for the sentencing at the bottom of the range.

8        THE COURT:  At this time I'll hear from Mr. Smith, if

9  you'd like to make a statement.

10        MR. HOSFORD:  He doesn't want to make a statement.

11        THE COURT:  All right.  Thank you.

12        At this time I'll hear from Mr. Lathan.

13        MR. LATHAN:  Your Honor, the defendant committed

14  these offenses at a time when he had already amassed a very

15  serious history involving violence, firearms and drug

16  distribution in the Wilmington area.

17        In 2009 the defendant is convicted on a robbery and

18  burglary count as set forth in paragraph 59 of the PSR.  This

19  offense involved the defendant breaking into a residence of the

20  victim for purposes of robbing and kidnapping the victim.  The

21  defendant took the telephone handset of the victim to prevent

22  the victim from calling for emergency assistance.  The

23  defendant subsequently robbed the victim of money and telephone

24  handset by threatening the use of a shotgun.

25        Lastly, the defendant assaulted the victim by

striking the victim in the face with a locked blade knife.
That was the defendant's first criminal conviction that
occurred in 2009.

The defendant would go on to be convicted in 2011 of
possession of a firearm by felon and then in 2015 a conspiracy
to sell and deliver heroin, sell and deliver heroin several
counts.

Upon his conviction in 2015, the defendant was
sentenced to 10 to 21 months in State custody.  His
post-release supervision began in 2016 and it was very soon
thereafter that the defendant would engage in the offense
conduct that gives rise to this sentencing; and that is, the
defendant would go on to become the leader, the five-star
general of one of the most violent gangs around, the 9-Trey
Bloods in Wilmington.

In that capacity the defendant directed and organized
and led and recruited the activities of the scores of
subordinate gang members who are responsible, and therefore the
defendant being responsible for mass heroin distribution and
mass acts of violence on the streets of Wilmington.  They were
truly a threat to the community and that can't be overstated.

The 9-Trey Bloods, Your Honor, the sect that the
defendant directed in Wilmington was a part of the United Blood
Nation.  This is a gang that's well-organized, the structure is
hierarchal in nature.  They maintain a strict chain of command.

Gang members are assigned a rank which comes with specific duties and responsibilities.  The defendant is essentially the leader of the Wilmington-based sect of the 9-Trey.

In that capacity the defendant reports to an individual by the name of Omar Reid, also known as Omega, and this is the Omega line of the United Blood Nation.

At the time of these offenses Omar Reid was serving a sentence of imprisonment in New Mexico based on a North Carolina conviction as part of a prisoner exchange program. And just to evidence the structure and the organization of this violent and dangerous gang, as part of this Title III wiretap where the defendant's phone conversations are being intercepted, he's communicating with Omar Reid, who is in New Mexico in his cell still continuing to direct the activities of his various sects along the east coast.  They converse and discuss the activities of the gang, they discuss the gang activities going forward and the defendant takes what Omar Reid gives him and he carries those orders out.

That context is important because all the offenses that are charged in this indictment, both the defendant's and his co-conspirators, are all gang-related.  It all goes back to the activity of the gang.

We discussed the conspiracy to commit murder.  Just this snapshot that the investigation gives us of the activities of this gang really just over about a month-long period of time

evidenced multiple conspiracies to commit very serious violent crimes. It evidenced a gang that maintains scores of firearms, which they keep at various locations in Wilmington which are available for use by the gang at the drop of a hat, any time there needs to be a robbery committed, a home invasion committed, some act of violence, a drive-by shooting, there are dozens of firearms and ammunition waiting for that 18-year-old, that 19-year-old to grab that gun and then go start firing bullets on the streets of Wilmington. That was the 9-Trey. That's the violence.

And then there's the heroin distribution. Calls were intercepted on a daily basis with the defendant and other gang members in furtherance of their efforts to take the poison that is heroin and sell it on the streets for the gang, and the defendant was at the center of all of that. Sometimes it was the defendant who had the heroin, sometimes he would direct them to Khalil Truesdale, Nutty, or one of the fellow gang members, but that is pretty much the lifestyle that these individuals live; gang violence and heroin distribution.

We've already discussed the conspiracy to commit murder of this rival gang member in Goldsboro, the defendant's efforts to organize and lead that conspiracy and carry out that hit where he reaches out to all his fellow gang members, and this is evidence of the power and authority that he has, the ability of this defendant to make things happen, bring me the

guns, bring me the Glock, bring me the MP.  Within a relatively

short period of time, there's a virtual stockpile of firearms

and ammunition sitting in the kitchen with the defendant.

Law enforcement executes a search warrant just in the

nick of time apparently and found in the back, in the backyard

is an AR .22 caliber assault rifle with a 30-round magazine,

.38 caliber revolver, two stolen 9mm handguns, a stolen .40

caliber handgun, another stolen .45 caliber handgun, another 45

caliber handgun, a .38 caliber Derringer, a .40 caliber handgun

loaded with 10 rounds of ammunition, a .22 caliber handgun

loaded with five rounds of ammunition, another .22 caliber

handgun loaded with nine rounds of ammunition, a 12-gauge

shotgun, an assault rifle, a military-grade ballistic vest and

a whole host of additional rounds of ammunition.  They meant

business and this is just a day in the life of the 9-Trey

Bloods.

Around the same period of time, there are more than

one iron in the fire.  There are other conspiracies, a

conspiracy to rob a rival gang member, Reese Gotti, there are

conspiracies to conduct drive-by shootings on other rival gang

members, the BO Boys.  And at the forefront of all of this, the

puppet master is the face of the gang, the defendant.

And this Court has sentenced other members of the

gang, other charged in the conspiracy.  One of the common

narratives you see when you have a 20-year-old or a 19-year-old

gang member who is being sentenced now for heroin distribution
or firearm possession, or what have you, is looking back at
their life and trying to determine, and their family is trying
to determine, how did he fall into the crosshairs of the gang.
How did he go from being a 12-year-old kid to a 19-year-old
gang member.

And one of the common themes you see is
vulnerabilities at that early age.  You see lack of a father,
you might see lack of family support, you might see substance
abuse issues, you might see some mental health issues, some
anger issues, but all things that make that youngster
vulnerable and in that situation is wherein steps the gang, in
steps the predator who seizes upon those vulnerabilities and
brings that person into a gang, into a group where all of a
sudden for the first time they feel special, they feel
appreciated, they feel like they are somebody.  But the next
thing you know, you're in a gang and you can't get out.  And
you're doing drive-by shootings and you're selling heroin.

And the puppet master, the person who is preying on
those vulnerabilities is the defendant in this case.  And he
did that for an extensive period of time.  He was aggressive
about it.  It's not just the violence, it's not just the
heroin.

On this Title III wiretap scores of conversations are
intercepted where the defendant is actively going out and

```
 1  trying to recruit other gang members, trying to build the gang
 2  up and make it as big and as well-organized as he can, trying
 3  to bring gang members in who are about to get out of prison,
 4  people who are trying to be rehabilitated the defendant is
 5  trying to bring them home, back into the gang once they get
 6  out.
 7          He truly went about his life with the criminal
 8  mindset, the mindset of a leader of a gang.  And for those
 9  reasons, Your Honor, we would submit that a sentence at the top
10  of the advisory guideline range is appropriate.
11          THE COURT:  Thank you.
12          Anything else, Mr. Hosford?
13          MR. HOSFORD:  No, Your Honor.
14          THE COURT:  The Court recognizes its obligation to
15  impose a sentence sufficient, but not greater than necessary,
16  to comply with the purposes set forth in the statute.
17          I have considered all arguments Mr. Hosford has made,
18  I have considered the position the United States, I have
19  considered the advisory guideline range.
20          Among other things, I'm to consider the nature and
21  circumstances of the offense and the history and
22  characteristics of the defendant, the need for the sentence
23  imposed to reflect the seriousness of the offense, to promote
24  respect for the law and provide just punishment.
25          The need for the sentence imposed to deter others who
```

might choose to engage in the criminal behavior that brings you here; the need for the sentence imposed to protect the public from further crime by you; the need for the sentence imposed to provide you with needed education or vocational training, medical care or other correctional treatment in the most effective manner.

The statute lists numerous other factors. I have considered all those factors, although I won't mention each one individually.

As for the nature and circumstances of the offense, there were five offenses here: Conspiracy to distribute a quantity of heroin, distribution of a quantity heroin and aiding and abetting, and possession of a firearm by felon. You engaged in all of this conduct in your role as the leader of the Bloods gang in Wilmington, so-called five-star general.

As part of your gang leadership role you obviously were actively participating in distributing heroin in Wilmington. The conduct of the gang was captured on the Title III wiretap and through other law enforcement efforts as we've talked about here.

Your criminal behavior includes not only the distribution of heroin and conspiracy to distribute heroin, but the leadership in the gang, including a conspiracy to commit murder and/or aggravated assault in connection with a rival gang member named Gullah in Wilmington.

1          The PSR details in a quite chilling fashion your

2   plans in paragraphs 26 through 35 to gather up the weapons and

3   lead a team of gang bangers to Goldsboro to murder Gullah.

4          As a result of the Title III wiretap and execution of

5   the search warrant, you weren't able to effect that murder.

6          You also conspired to rob Reese Gotti, Bellamy, as

7   reflected in paragraphs 36 through 43 of the PSR; again

8   criminal behavior; again, the PSR details in chilling fashion

9   the depth of your criminality and the gravity and willingness

10  to do whatever it took to advance an interest of the gang and

11  your own interest.

12          Likewise, the PSR details your conspiracy to assault

13  or murder BO Boys; again, some perceived rival gang members.

14  The PSR also details how you directed gang members to commit a

15  robbery and how you actively recruited gang members,

16  disciplined gang members.  So it's absolutely horrible criminal

17  conduct.

18          As for you, you're 24 years old, you never finished

19  high school.  The report indicates I think you left high school

20  in the tenth grade, you don't have a GED, you never had a job

21  in your life, and smoking dope and getting drunk every day

22  since you were the age of 15.  When you weren't out conducting

23  crimes, you were getting high and getting drunk.  Basically

24  spent a quarter of a century on Earth and done nothing

25  productive at all.

1     I will impose a sentence today that will protect the

2  public.  There's a great need for incapacitation in this case.

3  It's not only that you haven't done anything productive, but

4  that you've done a lot of bad criminal things.

5     We've talked about the crimes that bring you here;

6  but even before that, beginning at age 16, you where convicted

7  of common law robbery and second degree burglary; at age 18,

8  felon in possession of a firearm; age 21, conspiracy to sell

9  and deliver heroin.

10     For all of these crimes you received essentially a

11  slap on the wrist.  There will be no slap on the wrist today.

12  Today there will be punishment.  It will be severe and it will

13  be necessary.  People in New Hanover County have long, long,

14  long needed to be protected from Kejuan Tizom Shabazz Smith and

15  today those people will be.

16     Mr. Smith will reap the world of the life he's chosen

17  to live by getting to spend more time in prison than he's been

18  alive.

19     A sentence at the low end would not promote respect

20  for the law in any way, shape or form.  Whatever good

21  Mr. Taylor is doing, those efforts would be wasted with

22  Mr. Smith.  Mr. Smith needs to be incarcerated for a long time.

23  He is a dangerous man.

24     Having fully considered the entire record in the

25  case, it's the judgment of the Court that the defendant is

hereby sentenced to 240 months on Counts 1, 3, 5 and 6 to be served concurrently and 87 months consecutive on Counts 12 and 13 producing a total term of 327 months.

Upon release from imprisonment the defendant shall be placed on supervised release for three years. This consists of three years on Counts 1, 3, 5, 6, 12 and 13, all to run concurrently.

While on release he shall comply with the standard conditions and the following additional conditions:

He'll participate in a narcotic addiction treatment program, he'll consent to a warrantless search, cooperate in the collection of DNA. He'll pay a special assessment of $600. The Court is not going to impose a fine.

I do think I properly calculated the advisory guideline range. I do note that I'm aware that the *Gattis* case will address the career offender issue. Regardless of the outcome of *Gattis* and how it might impact the calculation of the advisory guideline range in this case, I announce pursuant to *U.S. v. Gomez-Jimenez*, 750 F.3d 370 (4th Cir. 2014) and *U.S. v. Hargrove*, 701 F.3d 156 (4th Cir. 2012) that I'd impose the same sentence as an alternative variant sentence.

Kejuan Tizom Shabazz Smith needs and deserves a sentence in total of 327 months and I would give him that sentence regardless of whether I miscalculated the advisory guideline range, regardless of whether the Fourth Circuit

ultimately determines in *Gattis* that the conviction at issue

that we discussed earlier in this sentencing hearing doesn't

qualify, I would vary up and sentence Mr. Smith to this exact

same sentence for all the 3553(a) factors.  He's an

extraordinary, dangerous criminal, he needs to be incarcerated

for the time period I outlined, and I would impose this same

sentence even if I miscalculated the advisory guideline range

as described in *Gomez-Jimenez* and *Hargrove*, the two cases that

I have cited.

This defendant shall be kept separated from all

co-defendants while incarcerated with the BOP.  I recommend

intensive substance abuse treatment, vocational and educational

opportunities.

Mr. Smith, you can appeal your conviction if you

believe your guilty plea was somehow unlawful or involuntary or

there was some other fundamental defect in the proceeding that

was not waived by your guilty plea.

You also have a statutory right to appeal your

sentence.  With few exceptions, a Notice of Appeal must be

filed within 14 days of the judgment being entered on the

docket in your case.

If you're unable to pay the cost of an appeal, you

may apply for appeal in forma pauperis.  If you so request, the

Clerk of Court will prepare and file a Notice of Appeal on your

behalf.

1          Anything else, Mr. Hosford?

2          MR. HOSFORD:  May it please the Court.  We do object

3     to the sentence and thank the Court for the extra time to meet

4     and discuss.

5          THE COURT:  Thank you.

6          Anything else, Mr. Lathan?

7          MR. LATHAN:  No, Your Honor.

8          THE COURT:  Okay.  I thank counsel for their work

9     here today.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          UNITED STATE DISTRICT COURT

2         EASTERN DISTRICT OF NORTH CAROLINA

3

4

5          CERTIFICATE OF OFFICIAL REPORTER

6

7  I, Amy M. Condon, CRR, CSR, RPR, Federal Official Court

8  Reporter, in and for the United States District Court for the

9  Eastern District of North Carolina, do hereby certify that

10 pursuant to Section 753, Title 28, United States Code, that the

11 foregoing is a true and correct transcript of the

12 stenographically reported proceedings held in the

13 above-entitled matter and that the transcript page format is in

14 conformance with the regulations of the Judicial Conference of

15 the United States.

16

17

18 Dated this 14th day of February, 2018.

19

20                          /s/ Amy M. Condon_____

21                          Amy M. Condon, CRR, CSR, RPR
                            U.S. Official Court Reporter

22

23

24

25